# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 28, 2009 Session

## THOMAS T. NICHOLSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Loudon County**
**No. 10785      E. Eugene Eblen, Judge**

_____

**No. E2009-00213-CCA-R3-PC - Filed May 12, 2010**

_____

The Petitioner, Thomas T. Nicholson, appeals the denial of post-conviction relief in the Criminal Court for Loudon County from his conviction upon a plea of nolo contendere to sexual battery by an authority figure, a Class C felony, for which he received a six-year sentence in the Department of Correction.  On appeal, the Petitioner contends that he received the ineffective assistance of counsel and that as a result, his plea was not voluntarily, knowingly, or intelligently entered.  We hold that the Petitioner received the ineffective assistance of counsel because he was given erroneous advice about release eligibility.  We reverse the judgment of the trial court denying post-conviction relief, we vacate the Petitioner's conviction, and we remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Conviction Vacated; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

John E. Eldridge, Knoxville, Tennessee, for the appellant, Thomas T. Nicholson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Russell Johnson, District Attorney General; Frank A. Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The case relates to the Petitioner's plea of nolo contendere to the sexual battery by an authority figure of his six-year-old neighbor, J.B.  The Petitioner was originally charged with aggravated sexual battery, a Class B felony, with a relevant range of punishment of eight to

twelve years. At the post-conviction hearing, Jim Widener of the Blount County Sheriff's Department testified that on December 23, 2003, before the Petitioner had been charged with the offense underlying this appeal, he administered a polygraph test to the Petitioner at the request of John Houston of the Loudon County Sheriff's Office. He agreed that he gave the Petitioner a rights waiver form, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and that he collected the Petitioner's biographical data. He said a polygraph evaluation was on the back of the form.

Mr. Widener agreed that he discussed the case and formulated questions with the Petitioner during the "pretest phase," which he said was normal procedure. He acknowledged the difference between law enforcement and private polygraphers. He said a control question was used to determine when a person was being truthful. He explained that a person reacts the same to all questions and that the polygraph scores the intensity of the reactions. He said that after he administered the polygraph examination, he scored it while the Petitioner left for a while. He said the Petitioner failed the exam, and he agreed that when he and Houston resumed their conversation with the Petitioner, they had already determined that the Petitioner had violated the law.

Mr. Widener testified that he did not administer a second Miranda warning before he resumed questioning of the Petitioner after the polygraph examination. He said the interview was videotaped. He agreed that the purpose of the interrogation was to inquire why the Petitioner failed the polygraph, to get an admission from the Petitioner, and to get a written confession. He could not remember whether Houston was present for the entire interview, but he said he would defer to whatever was shown on the videotape. He agreed that during the interview, he and Houston used phrases such as, "You need to put this behind you," "You need to get straightened out and move on," and "You need to fess up, it's the best thing you can do." He said Houston told the Petitioner that Houston had not spoken with the district attorney but that if the Petitioner would cooperate, things would be easier for the Petitioner. He could not recall whether he told the Petitioner that the polygraph machine did not lie or whether Houston told the Petitioner, "[J]ail is not in the cards. The parents of the child don't seem to care or be concerned. I just don't see nothing bad coming out of this maybe just simple assault." He agreed that the videotape would give an accurate account.

On cross-examination, Mr. Widener testified that in every case, he wanted to uncover the truth. He acknowledged that when a suspect submits to a polygraph examination, he explains to them that they are doing so voluntarily. He agreed that he told the Petitioner that the Petitioner was free to leave at any time and that he advised the Petitioner of his Miranda rights even though he was not required to do so. He agreed that he talked to the Petitioner in a "folksy" way and that he did not raise his voice. He did not agree that his job was to make sure the State got a conviction or to help the Defendant's case. He said that if another

officer did something inappropriate, unethical, or illegal during a polygraph examination, he would stop the examination. He said that he would not continue the examination of a person who seemed to be overly distressed and that he did not feel that he or Houston had unduly pressured the Petitioner. On redirect examination, Mr. Widener identified the Petitioner's written statement, which had been taken by Houston several days before the polygraph exam, and the statement was received into evidence.

Marena Martin, a child protective services investigator with the Department of Children's Services (DCS), testified that she conducted an investigation involving the Petitioner in December 2003. She said that she sent a "letter of indication" to the Petitioner after her child protective services investigation was complete and that the Petitioner did not make any contact with DCS. She said she received a letter from trial counsel asking her what meetings had taken place and what had been documented. She said that there was a videotaped forensic interview with the victim and that DCS also interviewed the Petitioner's children and three other children who were reported to have been in contact with the Petitioner. She said that a representative from the district attorney general's office was present during the interview with the victim, during the protective investigative team review meeting, and probably again before the trial. She could not remember when the DCS file was turned over to the prosecutor. The DCS file was received into evidence under seal for in camera viewing by the trial court.

On cross-examination, Ms. Martin testified that no additional allegations or charges were brought as a result of the interviews with the other children. On redirect examination, Ms. Martin testified that the other children did not report any wrongdoing by the Petitioner.

The Petitioner testified that he had never been in trouble with the police or arrested before his conviction. He agreed that he had never been given a polygraph examination, that he had never been interrogated by the police, and that he had never been in a courtroom on a criminal matter before this case. He said that he had been a reserve officer with the Loudon County Sheriff's Department. He said that he received a call on December 20, 2003, asking him to meet John Houston at the Loudon County Justice Center. He said that Houston was a friend with whom he had twice ridden on patrol and that he assumed the request was related to his work. He said that Houston asked him if he knew J.B. and that he replied his son and J.B.'s brother were best friends. He said that Houston informed him that J.B. claimed he had put his hand inside her pants. He said he denied it. He said that he also made a written statement denying the allegation in response to Houston's request, that Houston asked him to take a polygraph test, and that he agreed.

The Petitioner testified that he telephoned J.B.'s mother and that J.B.'s mother stated she believed the Defendant and also believed her daughter. The Defendant said he told J.B.'s

mother that she had done the right thing, "which any concerned parent would have done and which . . . I would have done." He said he did not inquire about J.B.

The Petitioner testified that Houston asked him to meet at the Blount County Justice Center to take a polygraph exam, which he did. He said that he, Houston, and Widener met for quite a while before he took the exam and that they took about a thirty minute break after the exam. He said he did not receive a second Miranda warning before questioning resumed. He said that he could not remember receiving the first Miranda warning but that he must have because he had seen the waiver form which he had signed. He said Widener told him that the polygraph computer indicated he failed the polygraph examination but that what mattered was Widener's opinion and Widener believed he had lied. He said that after questioning resumed, Widener and Houston tried to get him to say he did "something" to J.B., and he kept saying that he had not. He said they told him that "it will go away" if he admitted to touching J.B., that he might have done something to J.B. and not remembered, that J.B. alleged more than one incident, that J.B.'s parents were more concerned about their son remaining best friends with his son, and that the district attorney would charge him with assault at most. He said that he told them any placement of his hands on J.B. had not been sexual and that it would have been to keep her from falling off his lap while they sat at the computer. He said they told him to "just say yes." He said he did not give a written statement. He said he told them he would have to make up a story and would need time.

The Petitioner testified that he did not suspect he would be charged but that his in-laws encouraged him to hire a lawyer, which he did about a week after he took the polygraph examination. He said that he hired trial counsel for $3,000, which he understood would cover the handling of his case. He said that there was never any talk of additional charges and that after the plea hearing, his mother received a bill for an additional $12,712.50. He said that he told counsel about the DCS interviews with the other children but that trial counsel did not do anything about them. He said that he appeared in court at the indictment, that counsel went into the "back room," and that when counsel returned, counsel stated trial was set for June 2, 2005. He said that he did not appear before a judge and that from the day he was indicted until the day of the plea, he was not in court again about his case. He said that toward the end of his case, he spoke with counsel on the telephone and saw him perhaps three or four times. He said that the only discovery he received from counsel was a copy of his videotaped interview. He said that he did not receive a copy of the district attorney's file and that he first viewed the file after post-conviction counsel obtained it. He said he did not see his written statement from December 20 until a few weeks before the post-conviction hearing. He said that he never saw the videotape of J.B.'s interview with DCS. He said he asked trial counsel to view it but that counsel said the district attorney would not allow the Petitioner to see it. He said that counsel had watched it and had told him it was "pretty believable." He said counsel never discussed a trial strategy or a defense theory. He said

-4-

counsel wanted to know what he planned to say and that they reviewed his planned testimony. He said counsel did not review the elements of the offense charged or speedy trial issues. He said counsel told him it was a good idea to delay his trial as long as possible because stories change or people pass on or retire. He said he never heard of a plea bargain until the day of the trial.

The Petitioner testified that about two or three weeks before trial, trial counsel told him that he should plead guilty and accept an eight-year sentence. He said counsel advised him that because of a recent television news broadcast about his case, if he went to trial, the jury would find him guilty and he would be sentenced to twelve years at one hundred percent service. He admitted that he felt as if he had said "yes" when questioned about touching J.B., and he said counsel told him he would need to explain in his testimony "why I said yes after four hours talking with Houston and Widener." When asked if counsel had discussed his statement and whether it might be suppressed, he replied, "[Counsel] said that due to it being a polygraph examination that it's possible we might not be able to have the tape viewed while Mr. Widener was in the room due to the fact that he was a polygraph examiner. And he was going to try to do that." He said that on the day of trial, however, the bailiff brought in a television monitor in order that the videotape could be viewed. He said counsel told him they were going to watch approximately ten minutes where only Houston and he appeared. He said counsel did not inform him that counsel had filed motions to suppress or to dismiss. He said that on the morning of trial, he anticipated going to trial, that he had not entertained any notion of pleading guilty to anything, and that he had told counsel this on three to five occasions. He said he told counsel he was innocent and wanted a trial. He said that in response to J.B.'s mother's statement to the media that he needed to pay and that there were many more children who had been involved, counsel responded to the media that the Defendant was innocent and planned to go to trial.

The Petitioner testified that his family accompanied him to the trial. He said that trial counsel took them into the jury room and told them that due to the pressure of the news broadcast, the jury would find him guilty and sentence him to twelve years. He agreed that he believed he would receive a twelve-year sentence if he went to trial. He said counsel left the room and came back with a plea offer of sexual battery by an authority figure, with a sentence range of three to six years and service at thirty percent. He was told that he would have to "take all six years." He said that when he asked about serving three years, counsel replied, "30 percent of six they might go with, 30 percent of three they won't." He said that another offer contained the word "attempted" and that counsel and counsel's assistant explained he would have to serve thirty-five percent of six years, which was about one and one-half months longer. He said that shortly before noon, counsel said the judge wanted an answer. He said he chose to take what he thought was the shorter sentence. He said that counsel told him the sentence would be a maximum of 1.8 years and that with "good time"

it would shorten to about one year and two or three months. He said counsel told him that if he took the plea offer, he would be out of prison in time to teach his son to drive.

The Petitioner testified that trial counsel explained that a plea of nolo contendere meant that he was not admitting guilt. He said he again told counsel that he did not do anything to J.B., that he understood the nolo contendere plea to mean that he did not do anything, but that one year would be similar to going overseas as he had done in the Navy. He said counsel and counsel's assistant assured him that at the end of a year, he would be able to put the whole thing behind him. He said he did not understand and counsel did not explain that a nolo contendere plea was treated in the law as a guilty plea. He said that counsel never mentioned parole or that a psychiatrist or licensed psychologist would have to certify that he did not pose a likelihood of committing a sexual offense in order that he be released on parole, pursuant to Tennessee Code Annotated 40-35-503(c).[1] He said that he had since been up for parole and that he was told to "take it to the door," meaning that he would have to serve the entire sentence of which over four years remained. He said that counsel did not explain the lesser-included offenses of aggravated sexual battery or tell him that if he had gone to trial, the jury would have been able to determine whether he was guilty of a lesser-included offense. He said counsel did not say that sexual battery by an authority figure was a lesser-included offense of aggravated sexual battery. He agreed that he pleaded guilty to sexual battery by an authority figure to avoid the twelve-year sentence at one hundred percent service and that he had since learned sex offenders were usually denied parole. He said that he would have proceeded to trial had he known.

The Petitioner testified that neither trial counsel nor the trial court informed him that his indictment for aggravated sexual battery required amendment to sexual battery by an authority figure in order for the plea to be valid. He said that counsel also represented him in his divorce and advised him to "just say yes" when he appeared before the judge, even if he were unsure of a response. He said that this instruction affected him at the guilty plea hearing because he felt he was only permitted to answer "yes." He said that during the plea hearing, there was a loud argument between his mother and his ex-wife in the hallway

---

[1] T.C.A. § 40-35-503(c) provides in pertinent part:

> No person convicted of a sex crime shall be released on parole unless a psychiatrist or licensed psychologist designated as a health service provider has examined and evaluated the inmate and certified that, to a reasonable medical certainty, the inmate does not pose the likelihood of committing sexual assaults upon release from confinement. The examination and evaluation shall be provided by psychiatrists or licensed psychologists designated as health service providers whose services are contracted or funded by the department of correction or the board of paroles.

outside the courtroom that distracted him. He agreed that the transcript from the guilty plea hearing reflected that he nodded his head when the trial court asked him if he understood the plea agreement. He said this occurred while he was distracted by the commotion in the hallway.

The Petitioner testified that he asked trial counsel during the guilty plea hearing what would happen if he changed his mind and counsel responded that "once you take the plea it's over." He said that about two weeks later, he called counsel and stated he no longer thought the plea bargain was a good idea. He said that counsel replied that he received a "great deal" and that a year would pass quickly. He said he asked if he could set aside the plea and counsel again stated that it was a "great deal." He said he did not believe that his plea was made voluntarily because counsel coerced him to take the plea because it was the "easy way out" for counsel. He said he would not have taken the plea if he had known that he was going to have to serve a six-year sentence in confinement. He said that from what he had learned since the guilty plea hearing, he did not believe that counsel had ever been prepared for the trial and that counsel's lack of preparation affected the advice he was given. He said he never saw a copy of the indictment prior to the plea hearing.

On cross-examination, the Petitioner would not agree that he wanted to have the case resolved quickly. He said trial counsel told him the case would take a long time. He agreed that initially, he did not think the case was a "big deal" because he had done nothing wrong. When asked whether he remembered his girlfriend's stating that she would convict him after watching his videotaped interview, he responded that his girlfriend also said she would want to see all the evidence. He said counsel told him that things looked bad for him. He agreed that he did not have to take the polygraph examination, that he went voluntarily, that he could have left at any time, and that he received <u>Miranda</u> warnings. He said that he understood his rights and that he had seen them before on television. He said that although Widener told him he was free to leave, he felt he could not until the police got a confession. He acknowledged that he walked out at the end of the interview without giving the officers a written statement. He said that Houston told him that he had some time to make up a story and that he was supposed to contact Houston after Christmas and have a statement ready. When asked why it took time to tell the truth, he replied, "It doesn't. But it takes time to make up a story." When asked why he would do that, he replied, "They told me everything I did was wrong. And the only way they could get rid of it was to say that I did it." He agreed that he never provided a written statement following the videotaped interview.

The Petitioner testified that he was told a $3,000 retainer was required by trial counsel. When asked if he understood what the word "retainer" meant, he replied that he "thought it was kind of expensive to have a case for $3,000." He said he did not recall counsel's telling him that there might be more fees, nor did he recall counsel discussing the

elements of the charge or of any other offenses to which he might have pled guilty. He said he and his girlfriend investigated the elements of the charge on the Internet. He said counsel never told him he might have to serve more than thirty percent of the sentence for sexual battery by an authority figure. He said counsel guaranteed him he would be released in a year and a few months. He said he did not remember the district attorney general's announcement of the plea agreement and sentence recommendations at the guilty plea hearing because there was a commotion in the hallway. He said that there was a pause in the proceedings and that the bailiff left the courtroom. He said he did not remember nodding yes to the trial court's question, "Is that the way you understand the agreement?" He said he did not nod because he was told to "say yes or no" when he was in front of the judge or was asked a question. He said that he asked counsel to view the videotape of the victim's statement and that counsel told him the district attorney would not allow it. He said his family members encouraged him to take the plea offer because it was the better of two options. He acknowledged that the trial court informed him he had a right to go to trial, that a jury was ready, and that he had the right to compel and confront witnesses. When asked whether he understood that there was always a gamble when a case proceeded to trial, he replied, "It wasn't a gamble in this case. I was told that if I went to trial I would be found guilty. It wasn't a question of they may or may not. [Trial counsel] told me they would find me guilty and they wouldn't believe me[;] they would believe her." He said that he was told he would have to register for only ten years on the sex offender registry if he accepted the plea offer and that this meant a lot to him. He agreed the nolo contendere plea also meant a lot to him.

William Nicholson, the Petitioner's son, testified that he was present for some of the discussions between the Petitioner and trial counsel. He said that according to trial counsel, the Petitioner was to be released after serving thirty percent of six years. He said he thought the Petitioner would be released either before or when he got his driver's license, which would have been within a year and eight months. On cross-examination, Mr. Nicholson acknowledged that he was not present for all the discussions about the plea offer and that he could not remember exactly which words were used. He recalled the Petitioner's being told that he would have to serve thirty percent of his sentence in confinement.

Alice Baumeister, the Petitioner's mother, testified that she met with trial counsel after the Petitioner was indicted and that trial counsel said the Petitioner was the worst witness in the world, that he had no defense for the Petitioner, that the jury would believe J.B., and that the best thing would be for the Petitioner to plead guilty. She said that counsel told her the district attorney would not allow them to view the video of J.B.'s statement. She said that she encouraged her son to plead guilty because counsel stated the court would find him guilty and the Petitioner would be "gone" for twelve years. She said that she also encouraged the Petitioner to take the plea offer because he would be required to register with the sex offender registry for only ten years. She said that she understood the Petitioner would be

incarcerated for only one and one-half years. She said that they discussed the fact that the Petitioner would probably miss his daughter's high school graduation but that he would be out of prison in time to teach his son to drive.

On cross-examination, Ms. Baumeister testified that she met with trial counsel at his office maybe twice and that she inquired about a psychosexual evaluation. She said that counsel responded that it was too soon for such an exam and that they would need to wait until closer to the trial. She did not agree that she offered counsel $25,000 to have the case dismissed, but she said she offered him $10,000. When asked how counsel was supposed to accomplish a dismissal, she responded, "[S]uppos[ab]ly he had a defense. Finally."

Joe Baumeister, the Defendant's stepfather, testified that he was present for the first half of the discussion between the Petitioner and trial counsel concerning the plea agreement. He said that counsel recommended the Petitioner accept the plea because counsel did not think counsel could win the case. He said counsel advised that the Petitioner would have had to serve twelve years in confinement if the Petitioner went to trial. He said the plea offer was for three to six years, and with parole, he expected the Petitioner to be released in eighteen months or less. On cross-examination, Mr. Baumeister confirmed that he was not present for the last half of the discussion and that the final decision was not made in his presence.

Trial counsel testified that he had been licensed to practice law in Tennessee in 1973 and that he practiced until 1996, when he left to work in the trust department of a bank. He said he did not keep his law license up to date during the time at the bank. He said he returned to practice in 2001.

Trial counsel testified that he met with the Petitioner before the Petitioner had been charged with a crime. He said that he did not enter into written contracts with clients and that he verbally informed the Petitioner of his fee. He said that the Petitioner paid the retainer in two installments and that he believed the Petitioner paid him for handling the Petitioner's divorce. He said that he explained the retainer and hourly billing arrangement. He said that the itemized statement from February 8, 2006, was prepared by his staff by their going through his file, relying on his notations, and calculating the time spent on each task. He said he did not always keep a contemporaneous record of his time. He said that he approved the statement.

Trial counsel testified that the district attorney general's office had an "open file" policy and allowed him to view the Petitioner's file and to copy what he wanted. He said he filed a discovery request. He said that he did not give the Petitioner copies of the file's documents but that he gave the Petitioner a copy of the Petitioner's videotaped statement. He said that he viewed J.B.'s statement at the district attorney's office. He could not recall

whether the district attorney told him that he could not have a copy of the videotape, but he believed he was not entitled to a copy because of the confidentiality rules involving minor children. He said the Petitioner did not ask to see the videotape of J.B. He agreed that his billing statements showed he met with the Petitioner in January 2004 and that he did not meet with the Petitioner again until January 2006. He claimed that he had met with the Petitioner a few other times, although he agreed that none of those meetings were reflected on the billing statement. He acknowledged that the billing statement showed he reviewed the videotape of the Petitioner's statement one week before the trial. He agreed that the billing statement listed 5.4 hours of reviewing videotape on January 28 and 5.5 hours of reviewing videotape and research on January 29. He explained that he was documenting the statements on the videotape by a numbering system in order to locate specific portions at the trial.

Trial counsel agreed that four witnesses were listed on the Petitioner's indictment. He said that he interviewed Houston and that he could not remember whether he talked to Houston about the DCS file. He said he did not make a memorandum of the interview but that he might have made notes. He said he spoke to someone at DCS, but he could not remember whether it was Ms. Martin. He recalled that the other children's father told him that DCS had interviewed them and that the father was glad the Petitioner had not molested them. He said he did not interview the other children because he did not believe the interviews would have been exculpatory to the Petitioner. He would not agree that he should have filed a motion for exculpatory evidence and asked for memoranda of the DCS interviews with the other children. He said that he attempted to talk to J.B.'s mother via telephone and that she refused. He said he did not attempt to interview J.B. He said he did not interview Widener about the procedures for polygraph exams. He would not agree he told the press that the Petitioner was innocent and that he would fight in court. He said that he conducted most of the research himself and that he did not have an investigator.

Trial counsel testified that he filed motions in limine and to suppress about a week before the trial. He said that he would not disagree with the court record showing the motions were filed two days before trial. When asked if he knew that filing motions two days before trial was too late, he replied that the motions were not necessarily late if the purpose was to prompt the district attorney to negotiate. He said that he was familiar with local rule 201(B), which stated that absent compelling reasons, new motions filed within ten days of trial would be considered not timely filed and would be summarily overruled. He acknowledged there was no hearing on the motion to suppress.

Trial counsel could not recall the instructions he gave the Petitioner regarding the Petitioner's statements to the court about the Petitioner's divorce. He agreed that the Petitioner persisted in saying that he had done nothing wrong and wanted a trial, even on the morning the trial was scheduled. He said he told the Petitioner before the trial that if the

district attorney would reduce the charges, he would recommend the Petitioner accept a plea offer because he felt J.B. would make a credible witness and the Petitioner would not. He disagreed that he recommended the Petitioner accept an eight-year sentence. He said the Petitioner's recollection that he stated "take the plea or get twelve years in jail" was not true. He disagreed that he told the Petitioner he would have to serve only thirty percent of the six-year sentence for sexual battery by an authority figure. He said that he told the Petitioner he would have to serve at least thirty percent of the sentence. He said that he probably did not tell the Petitioner that sexual battery by an authority figure was not a lesser included offense of sexual battery, that the indictment would need to be amended, or that the Petitioner would need to consent to an amended indictment. He said that he explained to the Petitioner the range of punishment, the requirements for the range, and the consequences regarding the sex offender registry. He said that he also explained that the Petitioner was allowed time off for good conduct and that the plea did not mandate a day-for-day sentence. He could not remember whether he reviewed the elements of the offense with the Petitioner. He assumed but could not remember, whether he reviewed the statutes regarding a sex offender's release from custody, including the provision that the Petitioner would have to be certified by a mental health expert. He said that he probably did not tell the Petitioner that sex offenders usually do not get out of jail early or that the district attorney general likely would oppose parole. He could not remember whether the Petitioner contacted him after the plea hearing.

On cross-examination, trial counsel testified that the materials in his file were made available to the Petitioner. He agreed that having once been an assistant district attorney general, he was familiar with the district attorney's open file practice. He agreed that if the Petitioner had indicated a desire to see J.B.'s videotaped statement, he would have arranged it and taken the Petitioner to see it. He acknowledged that the Petitioner did not want to be on the sex offender registry for life and that he researched the sex offender registry rules. He said that he reviewed every element of the charged offense and the offense to which the Petitioner pled. He agreed that his usual experience with the local rule regarding late-filed motions was that the court leniently granted continuances. He explained the trial strategy had been to assert that the Petitioner was not guilty, that the Petitioner had been misled and admitted something he should not have, that there was a lack of opportunity to commit the offense, and to limit the charge to one occurrence. He said that the Petitioner's mother offered him $25,000 to make the case "go away" and that he refused it. He said the Petitioner's mother told him after the plea hearing that she was pleased with the outcome and was going to pay the rest of his fee, which he estimated to be $10,000. He said he had not been paid.

Trial counsel testified that he did not promise the Petitioner he would be released after serving thirty percent. He said he informed the Petitioner that the Petitioner would have to go before the parole board. He said the disturbance during the guilty plea hearing occurred

after the Petitioner's plea had been entered, and he agreed that it did not make sense for the Petitioner's family to be outside the courtroom during the hearing.

On redirect examination, trial counsel testified that it was not true that he waited until January 2006 to begin serious work on the Petitioner's case. He recalled talking with the Petitioner several times and meeting with the Petitioner and his girlfriend. He said he waited until two weeks before trial to do the majority of the trial preparation because he avoided having to prepare two or three different times. He said that he no longer had his trial notebook from the case but that he still had some of the notebook's contents. He produced "at least a partial outline of [an] opening statement" and part of J.B.'s cross-examination, which were received into evidence.

Knoxville attorney Jonathan Cooper testified that he had practiced law for fifteen years and that his practice consisted almost exclusively of criminal defense. He said that he had represented persons accused of sex offenses "many times." He said that he had reviewed the court file, the district attorney's file, the plea hearing transcript, and the discovery, including two videos, and that in his opinion trial counsel did not render effective assistance. He said his opinion was based on trial counsel's investigation and preparation of the case and counsel's representation of the Petitioner on the morning of the plea hearing. He based his opinion on the Petitioner's statements as well as the other witnesses' testimony at the post-conviction hearing. He said trial counsel's performance failed because counsel did not interview witnesses, did not prepare the Petitioner and witnesses for trial, did not communicate with the Petitioner, did not provide discovery to the Petitioner, and waited until the last two weeks before trial to "do the heavy lifting in his case preparation." He said counsel's failure to interview witnesses would not have allowed counsel to prepare adequately for the trial. He said counsel should have sought the statements from DCS concerning the other children because it would have been important for a jury to hear that similarly situated children who had been in the Petitioner's house had not made allegations of abuse. He said that counsel's filing motions two days before trial was not adequate and that it did not appear from the plea hearing transcript that counsel was willing to seek a continuance to give him more time to litigate the case. He said that the motion to suppress was critical and that counsel could not have effectively represented the Petitioner without having prosecuted it. He said that if the statement had been suppressed, half of the State's case would have been lost and that even if the statement had not been suppressed, counsel would have gained valuable testimony and insight into the State's case.

Mr. Cooper testified that any time a client contemplates a verdict or a plea to a sex offense, he informs them that the sentence will be different because parole eligibility for sex offenders is different. He said that the percentage of time after which sex offenders are eligible for parole is meaningless because they have to be certified eligible for release, which

does not happen on their release eligibility date. He agreed that trial counsel should have explained this to the Petitioner. He said that he was familiar with a Tennessee Court of Criminal Appeals case in which the dissenting judge stated that the odds of a person convicted of a sex crime being released on parole were slim to none.[2]

On cross-examination, Mr. Cooper testified that he had not tried any cases in the district in which the Petitioner had been prosecuted. He said he did not know the custom and practice of the trial court regarding late-filed motions before hearing about it at the post-conviction hearing. In response to a question regarding the custom and practice of the court regarding continuances, he said that in his experience, they were liberally granted. When asked if these were the sorts of things he should have investigated before coming to court to render an opinion, he replied that he did not base his opinion on the trial court's policy for granting continuances. He said he did not interview the prosecuting attorney or the State's attorney handling the post-conviction hearing. He would not agree that it would have been a good idea to interview the State's attorneys because he did not know how the interviews would be relevant. He said he did not speak to the trial judge about the alleged disturbance in the courtroom. He said he did not talk to the court reporter, the bailiffs, or the court officers from the day of the guilty plea hearing because the disturbance in the courtroom did not factor into the terms of his opinion. He agreed there was a dispute as to what occurred during plea negotiations. He said he was being paid an hourly rate of $225 for his work on the case.

The trial court received into evidence the Defendant's videotaped statement. In our view, it reflects that after the Defendant submitted to the polygraph examination and was informed that he had failed it, the following exchanges occurred:

> Detective Widener: You failed. Every time you were asked if you touched J.B., you failed. That's a foregone conclusion. We need to figure out was it three or four times and nothing more, or anything more than touching.
> . . .
> The Defendant: I don't recall putting my hand deliberately into her pants. I've been thinking about this all weekend. Did I do this? Was it wrong?
> . . .

---

[2] See Jerome William Devereaux v. State, No. E2004-01891-CCA-R3-PC, Jefferson County (Tenn. Crim. App. June 8, 2005) (Tipton, J., dissenting), app. denied (Tenn. Oct 24, 2005).

| | |
|---|---|
| Detective Widener: | Let me ask you this from being an investigator: Is [J.B.] the only child that you've ever touched inappropriately? |
| The Defendant: | Yes–yes. |
| | . . . |
| Detective Widener: | How long back do you remember it happened? |
| The Defendant: | I only recall the one time, maybe two times. She sat on my lap– |
| Detective Widener: | How long back does that go? |
| The Defendant: | Six months, a year. |
| | . . . |
| Detective Widener: | And there was never anything other than the touching? Right? |
| The Defendant: | That would have been it, yes. She sat on my lap, playing a game, my hands are holding her so she don't fall– |
| Detective Widener: | Do you remember putting your hand into her panties? |
| The Defendant: | I don't remember any arousal– |
| Detective Widener: | Let's just put the arousal out– |
| The Defendant: | Or any intention. |
| Detective Widener: | You remember it actually happening, though. You have to. |
| The Defendant: | I have to just since you're saying it's in there (pointing to the polygraph examination results). |
| | . . . |
| Detective Houston: | I've got down in here "a couple of times." |
| The Defendant: | No. Not a couple times. |
| Detective Houston: | How many? |
| The Defendant: | The one occurrence is all I can remember |
| | . . . . |
| | . . . |
| Detective Houston: | You stuck your hand down there. You know you did. |
| The Defendant: | That's what all the tests said. |
| | . . . |
| | Well, you know, anyways, since I said before, I mean, six months ago, just |

-14-

whatever got me. I don't know what date–eight months, six months, a year, whatever it was, it's kinda like "this ain't right, let's throw it out the window." And after that–this ain't right. Start over. Keep going forward. . . . The one occurrence that it happened. The next time she's on piggyback, I don't think anything about it. Okay. Bye. Have a good day. Just the one occurrence. . . . It happened–it was done, whatever it was.

. . .

Detective Widener: Just one time?

The Defendant: Yes.

Detective Widener: Remember when it happened?

The Defendant: No.

Detective Widener: About?

The Defendant: Yeah, . . . eight months ago.

. . .

I don't recall. I want a little time to think about the whole . . . I mean I . . . so I can get it all straight instead of making it up and adding–

Detective Widener: What was it that you did? That you realized you did something wrong.

The Defendant: Had my hands in her pants.

Detective Widener: In her panties?

The Defendant: (nods)

In its written order denying post-conviction relief, the trial court noted the conflict in testimony but did not make a credibility finding. The court stated:

A. The Petitioner alleges his decision to plead was based upon his having been told that he would be released from prison after "30% of six years[.]" The testimony presented is in conflict. The Petitioner maintains he was so informed while counsel testified he never assured Petitioner he would be released after service of 30%. The Petitioner's other witnesses testified to conversations concerning a 30% release date but did

-15-

not testify Petitioner was explicitly told he would be released after such percentage.

Very importantly, the Court notes that during the entry of the plea, the fact that the Department of Correction would be the agency governing his release date by parole was stated, as was the fact that while he was pleading as a Range I Standard Offender, he could do things that might cause him to serve more time. Most importantly, it was clearly stated that he needed to understand that this Range I Standard is an eligibility date and did not mean that he would be released precisely at that time. The Petitioner indicated that he understood his agreement in that way by nodding yes as to his understanding. The Court finds that the Petitioner has not carried his burden of proof as to this issue.

B. Petitioner maintains that counsel unreasonably failed to explain the nature and elements of the charge against him or of the various charges discussed in terms of a plea. Original counsel for the Petitioner testified that he was sure he had covered the elements of the offense with the Petitioner prior to the time of plea in that that was his practice in all cases. Trial counsel testified that the Petitioner's own family members opined to him that the Petitioner would be found guilty by a jury after they reviewed the evidence against him, and Petitioner in his Petition acknowledges that he gave a confession on video, albeit Petitioner claims said confession was false. It is the Court's opinion that Petitioner's decision to plead guilty was a tactical decision based upon the facts of the case and that even if the Petitioner did not have a clear understanding as to each and every element of each and every offense that might be involved in the case, a more complete understanding by him of the specific elements of any of the possibly involved offenses would not have resulted in a different decision by him or a different result. In any event, the Court does not find that he has established this ground by clear and convincing proof nor that he was so prejudiced by not understanding the elements of each and every such offense. This ground is without merit.

-16-

C. Petitioner claims that trial counsel unreasonably failed to prepare a defense for Petitioner at trial. Although not elaborated upon within paragraph c, the Court takes this ground to include Petitioner's allegations with regard to his statement and the potential suppression thereof.

At hearing the Court received testimony concerning the statement made by the Petitioner which was the subject of the Motion to Suppress filed by trial counsel. Had a hearing on said Motion been held before this Court prior to entry of a plea, based upon the proof presented at hearing the Court would not have suppressed such statement, feeling it to have been voluntarily and intelligently made. From the testimony at hearing it appears the State conditioned the plea agreement ultimately entered into upon the Petitioner not pursuing said Motion to Suppress in any event. Finally, the Court notes that even if said statement had been suppressed, the State would have been allowed to use it in cross examination should the Petitioner have testified and denied the allegations of the victim herein. Being fully cognizant of a defendant's right not to testify, in the absence of denial by the Petitioner at a trial, his odds of success would have been remote. The Court feels that the decision not to pursue the Motion to Suppress was a tactical one and within the realm of competent representation of the Petitioner. Said ground is without merit.

Petitioner alleges that the Court was without jurisdiction to accept the plea herein in that Sexual Battery by an Authority Figure was not and is not a lesser included offense of Aggravated Sexual Battery. Sexual Battery by an Authority Figure was listed as the conviction offense on not only the Judgement Order but also on the negotiated plea agreement signed by the Petitioner and his trial counsel. Under the applicable case law, the Court finds that the proceedings herein sufficiently put the Petitioner on Notice of the charge for which he was convicted and gave the Court jurisdiction to accept the plea entered herein. The Court finds the Petitioner gave knowing consent to what amounted to an amendment of the indicted charge and pled to same for tactical reasons to avoid the

-17-

risk of a much more significant sentence should he have been found guilty by a jury.

While the stipulation of fact did not cover all elements of Sexual Battery by an Authority Figure, this is not a constitutional defect and is not sufficient for Post Conviction Relief. The Petitioner's plea herein waived all non-jurisdictional defects. This ground is without merit.

Petitioner alleges that counsel failed to fully advise him of the impact of his plea in terms of the Sex Offender Registry Laws. The Court notes that it is not alleged nor has it been shown by any proof that counsel gave the Petitioner erroneous advice but rather that the advice given by him was incomplete. The Petitioner did not indicate in his testimony that these matters were significant in his determination of whether to accept or reject the plea offer ultimately entered into and clearly did not establish that but for counsel's advice concerning the Sex Offender Registry issues the result or his decision would have been different. This ground is without merit.

## ANALYSIS

The Petitioner contends that the trial court erred when it dismissed his petition for post-conviction relief. He argues that he received the ineffective assistance of counsel and that, as a result, his plea was not voluntarily, knowingly, or intelligently made. In this regard, the Petitioner lists six points on which he claims that counsel rendered ineffective assistance. The State counters that the trial court properly determined that the Petitioner received the effective assistance of counsel.

The burden in a post-conviction proceeding is on the Petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id. When a petitioner pleads guilty, he must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty. See Hill v. Lockhart, 474 U.S. 52, 59 (1985); Adkins v. State, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

## A. Motion to Suppress (Petitioner's issue I.A.)

The Petitioner argues that he received the ineffective assistance of counsel because trial counsel filed a motion to suppress and a motion to dismiss two days before the trial, despite knowing that a local court rule mandated summary dismissal of the motion unless it was filed at least ten days before trial. He argues that knowledge of the outcome of the suppression hearing was and should have been a critical factor in his decision to plead guilty. He also claims that his statement to Widener and Houston was not knowingly, voluntarily, or intelligently made and would have been suppressed had counsel prosecuted the motion. The State counters that the plea offer was conditioned on the Petitioner's withdrawal of the motion to suppress and that counsel made a tactical decision not to pursue it. Insofar as the plea offer was conditioned upon the Petitioner's withdrawal of the motion, we agree with the State.

This court has stated that if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence. See Robert C. Bellafant v. State, No. 01C01-9705-CC-00183, Maury County, slip op. at 10 (Tenn. Crim. App. May 15, 1998). Where there are no arguable grounds to suppress, the attorney is not ineffective by refraining from filing a motion to suppress. See Stephen Bernard Wlodarz v. State, No. E2002-02798-CCA-R3-PC, Hawkins County, slip op. at 7 (Tenn. Crim. App., at Knoxville, Dec. 3, 2003), app. denied (Tenn. May 17, 2004). Even if an attorney's failure to timely file the motion was deficient performance, the Petitioner must demonstrate that he was prejudiced by the deficiency.

In addition, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance of counsel. Vaughn v. State, 202 S.W.3d 106, 121 (Tenn. 2006) (citing Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992)). A petitioner "may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." Dellinger v. State, 279 S.W.3d 282, 295 (Tenn. 2009) (quoting Adkins v. State, 911 S.W.2d at 347). This court has stated that the abandonment of a motion to suppress in exchange for a plea agreement is not ineffective assistance when it is a tactical decision to avoid the risk of a greater punishment at trial. See Shon Maurice Pierce v. State, No. W2005-01493-CCA-R3-PC, Dyer County, slip op. at 5 (Tenn. Crim. App. Mar. 16, 2006); see also Gary Randall Yarnell v. State, No. E2004-01762-CCA-R3-PC, Blount County, slip op. at 7 (Tenn. Crim. App. Aug. 15, 2005), app. denied (Tenn. Feb. 6, 2006).

At the evidentiary hearing in this case, the evidence was undisputed that the Petitioner made an inculpatory statement to the police before he hired trial counsel. In a videotaped

interview after the Defendant had voluntarily submitted to a polygraph examination, the Defendant admitted that he put his hands inside J.B.'s panties.

Counsel testified that he had reviewed the Petitioner's videotaped statement and J.B.'s videotaped statement and that he did not believe the Petitioner would make a credible witness. He said that he filed the motion to suppress to prod the State to make a plea offer because the State had been unwilling to negotiate a plea agreement. He acknowledged that the motion was filed late, but he noted that the trial court was lenient in granting continuances. In its order denying post-conviction relief, the trial court found that the decision not to pursue the motion to suppress was a tactical one. The court noted that the plea offer was conditioned upon the Petitioner's not pursuing the motion, and it stated that it would have denied the motion to suppress because it believed the Petitioner's statement was freely and voluntarily given. The record does not preponderate against the trial court's determination that counsel's decisions to file the motion to prod the district attorney to make a plea offer and not to pursue the motion were tactical ones and that counsel's decisions were within the realm of competent representation. The Petitioner is not entitled to relief on this issue.

### B. Exculpatory Evidence (Petitioner's issue I.B.)

The Petitioner claims that he received the ineffective assistance of counsel because counsel failed to pursue exculpatory evidence from interviews of children conducted by a DCS representative. When a Petitioner alleges that he received the ineffective assistance of counsel based upon counsel's failure to investigate a case properly, he bears the burden at the post-conviction hearing of demonstrating what that investigation would have revealed. Owens v. State, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999). If counsel failed to investigate or discover exculpatory evidence, "the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." Hill v. Lockhart, 474 U.S. 52, 59 (1985). The record reflects that counsel was aware of the DCS interviews but that he did not seek to review them because he believed that evidence tending to show that the Petitioner had not harmed similarly situated children was not exculpatory:

[Post-conviction Counsel:] In your possession you don't have any interviews of the [other] children do you?

[Trial Counsel:] No, I do not.

-21-

[Post-conviction Counsel:] That's not in the D.A.'s file was it?

[Trial Counsel:] No, sir, it was not. However, I had totally forgotten about this until it came up in examination earlier. I do recall [the other children's father] coming to me at some point and saying that I was representing [the Petitioner] and someone had interviewed his children. And you know he said he talked to them in great length and that you know he was lucky that they - [the Petitioner] had not done anything to them. And I had forgotten completely about that.

[Post-conviction Counsel:] Would that be exculpatory as far as you are concerned?

[Trial Counsel:] No, sir, I didn't think that the fact that the other children had been in the house at some point in time without having some sort of an event was exculpatory.

[Post-conviction Counsel:] In all fairness should you not have filed a motion for exculpatory evidence and asked for memorandums of those interviews?

[Trial Counsel:] Well, if I'm not mistaken I think that part of my discovery motion did include [a] motion for exculpatory evidence-

[Post-conviction Counsel:] You did not press that motion to get those memorandums of interview[s] which are now part of the sealed record?

-22-

[Trial Counsel:]   No, sir, I took what the D.A. had in the file in the open file policy.

We note that the interviews with the other children were received into evidence and placed under seal at the post-conviction hearing, but they are not contained in the record on appeal. Counsel testified that he filed a discovery motion which included a request for exculpatory evidence. Counsel also testified that simply because other children did not report sexual abuse at the hands of the Petitioner did not negate the victim's allegations. Although the trial court did not make findings of fact regarding counsel's decision not to pursue evidence contained within the DCS interviews, the record does not preponderate against the trial court's ultimate determination that the Petitioner failed to show that counsel's representation was deficient and that he was prejudiced as a result. He is not entitled to relief on this issue.

## C. Trial Preparation (Petitioner's issue I.C.)

The Petitioner contends that trial counsel failed to prepare a defense, despite knowing for two years that the Petitioner claimed he was innocent and wanted a trial, by failing to interview or subpoena Widener, Martin, the victim's parents, and the victim. The State responds that counsel did not render ineffective assistance of counsel because counsel prepared a defense strategy.

When a petitioner contends that trial counsel's failure to investigate or interview witnesses resulted in ineffective assistance, he must be able to "produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." Black v. State, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990). If a petitioner faults counsel for failure to interview known witnesses, he must likewise show that the witnesses had critical evidence that was not used, which prejudiced the petitioner. Id. at 757. Thus, a petitioner's failure to present the testimony of any witnesses that he claims should have been interviewed is fatal to his challenge of ineffective assistance based on failure to interview or discover witnesses. Furthermore, when a petitioner alleges that he received the ineffective assistance of counsel based upon counsel's failure to investigate a case properly bears the burden at the post-conviction hearing of demonstrating what that investigation would have revealed. See Owens, 13 S.W.3d at 756.

At the post-conviction hearing, the Petitioner questioned Widener and Martin, but not the victim's parents or the victim. The record shows that trial counsel attempted to interview the victim's mother but that she had refused. Nothing precluded the Petitioner from issuing subpoenas to the victim's parents or to the victim to appear at the post-conviction hearing.

-23-

Widener's testimony did not reveal any critical evidence that was not used and which prejudiced the Petitioner. Martin testified that she interviewed the victim, the Petitioner's children, and another family's children and that none but J.B. reported any inappropriate sexual contact. Although the trial court did not issue findings of fact concerning trial counsel's failure to interview witnesses, the burden was on the Petitioner to show by clear and convincing evidence what those interviews would have revealed and how the failure to conduct interviews prejudiced his case. The Petitioner did not carry his burden. The record does not preponderate against the trial court's determination that the Petitioner failed to show that he received the ineffective assistance of counsel with regard to counsel's trial preparation. The Petitioner is not entitled to relief on this issue.

### D. Erroneous Advice (Petitioner's issues III.A. and III.B.)

The Petitioner contends that his plea was based on trial counsel's erroneous advice that he would serve only thirty percent of a six-year sentence in confinement. The State counters that the Petitioner has failed to prove that but for counsel's alleged failure to inform him about the consequences of his sentence, he would have proceeded to trial.

The record shows that during the entry of the plea, the court informed the Petitioner that the Department of Correction governed the release date, that the release date was "an eligibility date and did not mean that he would be released precisely at that time," and that the Petitioner nodded his head to indicate his understanding. The trial court found that although trial counsel and the Petitioner's witnesses testified the Petitioner would have to serve at least thirty percent of his sentence in confinement, no witness testified that the Petitioner was explicitly told he would be released after that time.

Given the requirement that a sex offender will not be released on parole until it has been certified to a reasonably medical certainty that he or she poses no likelihood of committing sexual assaults, a thirty percent release eligibility date for the Petitioner was quite unlikely. See Clessie T. Jaco, Jr. v. State, No. M2001-02150-CCA-R3-PC, Maury County, slip op. at 2 (Tenn. Crim. App. Aug. 14, 2002), aff'd, 120 S.W.3d 828 (Tenn. 2003). This court has viewed as deficient performance an attorney's giving erroneous advice to a sex offender about release eligibility. See Alan Dale Bailey v. State, No. M2001-01018-CCA-R3-PC, Coffee County (Tenn. Crim. App. Feb. 8, 2002), app. dismissed (Tenn. July 11, 2002). However, an attorney who merely fails to discuss parole eligibility with his client does not render ineffective assistance. See Wade v. State, 914 S.W.2d 97, 104 (Tenn. Crim. App. 1995); Ricky Rutledge v. State, No. 01C01-9706-CC-0001, Bedford County, slip op. at 11 (Tenn. Crim. App. July 2, 1998), app. denied (Tenn. Mar. 1,1999).

In this case, trial counsel first testified that he would have informed the Petitioner about release eligibility if that information were contained in the statute defining sexual battery by an authority figure. Counsel next stated he assumed that he reviewed the release eligibility statutes with the Petitioner but that he could not remember. Counsel testified that he probably did not tell the Petitioner that sex offenders usually are not released on parole. In his brief, the Petitioner notes the prosecuting attorney's statement, "While it is a Range One standard plea and sentence there are things that the defendant can do that might cause him to serve more time. I don't expect that is going to happen...," supported his belief that counsel's advice about the plea offer was correct.

We note that the statute defining sexual battery by an authority figure does not address release eligibility. See T.C.A. § 39-13-527. In trial counsel's June 2, 2006 letter to Charles Nicholson requesting payment, he wrote:

> I am also enclosing herein a copy of the Judgment which was entered on [the Petitioner's] case with the Court and I have highlighted the portion which directly addresses his release eligibility to be "Standard 30%" which means after he has served 30% of his sentence. I understand there may be conflicting stories coming from someone at the prison but this copy should confirm what agreement was made and entered with the Court.

The testimony regarding what happened during the plea negotiations was in dispute. Counsel testified that he recommended the Petitioner accept a reduced sentence that would keep the Petitioner off the sex offender registry if the State offered it. He said he recommended this because he did not feel that the Petitioner would make a good witness. However, counsel said that he never told the Petitioner that the Petitioner would receive a twelve-year sentence if he did not accept the plea. The Petitioner and his family members, who were present at various times during the plea negotiations, all testified that the plea offer was the Petitioner's only alternative to a twelve-year sentence in confinement. The Petitioner and his witnesses also agreed that the Petitioner was told he would be released after thirty percent service. The Petitioner stated that if he had known that in practice, sex offenders were not released on parole, he would not have pled guilty and would have insisted on proceeding to trial. He said, without objection, that following a parole hearing, the parole board told him to "take it to the door," meaning that he would have to serve his entire sentence in confinement.

We conclude that the evidence preponderates against the trial court's findings that the Petitioner did not establish the allegations of fact by clear and convincing evidence. In our

view, the record reflects that trial counsel erroneously informed the Petitioner that he would be released after serving thirty percent of his sentence, when the Petitioner's chance of being released was highly unlikely. Four witnesses testified that the Petitioner was told by trial counsel that he would have to serve only thirty percent of six years. Counsel acknowledged that he "probably did not" inform the Petitioner that sex offenders are not usually released on parole. The State's prosecuting attorney stated at the plea hearing that the State did not believe the Petitioner would do anything to affect his thirty percent release eligibility. After the Petitioner was incarcerated, counsel sent a letter to the Petitioner's brother stating that the Petitioner would be released after thirty percent service. Finally, the Petitioner stated that he would not have pled nolo contendere had he known he would have to serve the full sentence. Taken together, these facts support the determination that the Petitioner was erroneously informed that he would have to serve only thirty percent of his sentence in confinement. We conclude that the trial court erred in finding that counsel's performance was not deficient and that the Petitioner was not prejudiced by counsel's deficient performance. We hold that the Petitioner received the ineffective assistance of counsel, and the Petitioner is entitled to relief on this issue.

### E. Setting Aside the Plea (Petitioner's Issue III.C.)

The Petitioner contends that he received the ineffective assistance of counsel when trial counsel failed to seek to set aside his nolo contendere plea within thirty days. The Petitioner did not raise this issue as grounds for relief in his original or amended petitions for post-conviction relief. The State has not addressed this issue.

A party may not raise an issue for the first time on appeal, and issues not addressed in the post-conviction court will not be addressed on appeal. Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005); State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). "There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." T.C.A. § 40-30-110(f) (2006). The Petitioner has waived this issue.

### F. Involuntary Plea (Petitioner's Issue II.A., II.B.)

The Petitioner contends that his plea was not voluntarily, knowingly, and understandingly entered because he received the ineffective assistance of counsel in that trial counsel failed to explain the nature and elements of the indicted charge and of the offense to which he pled nolo contendere. The Petitioner also contends that his decision to plead guilty was not a tactical one. The State contends that based on the totality of the circumstances, the Petitioner entered a knowing and voluntary plea of nolo contendere to sexual battery by an authority figure.

-26-

A plea of nolo contendere must be voluntarily, knowingly, and understandingly entered, and it has the same effect as a guilty plea. Crowe, 168 S.W.3d at 747; State v. Teague, 772 S.W.2d 932, 943-44 (Tenn. Crim. App. 1988). This requires that

> before accepting a . . . nolo contendere plea, the court shall address the defendant personally in open court and inform the defendant of, and determine that he or she understands the following:
>
> > (A) the nature of the charge to which the plea is offered;
> >
> > (B) the maximum possible penalty and any mandatory minimum penalty;
> > . . . .
> > (D) the right to plead not guilty or, having already so pleaded, to persist in that plea;
> >
> > (E) the right to a jury trial;
> > . . . .

Tenn. R. Crim. P. 11(b)(1); see also Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mellon, 118 S.W.3d 340, 345 (Tenn. 2003).

A defendant who pleads nolo contendere "effectively consents to being punished as if he were guilty." Crowe, 168 S.W.3d at 747 (citing North Carolina v. Alford, 400 U.S. 25, 35-36 n.8 (1970)). In Alford, the Court stated that when evaluating the knowing and voluntary nature of a guilty plea, "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the petitioner." 400 U.S. at 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). The circumstances include

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead

guilty, including a desire to avoid a greater penalty that might
result from a jury trial.

Powers v. State, 942 S.W.2d 551, 556 (quoting Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." Blankenship, 858 S.W.2d at 904. If a defendant has not been made aware of the key consequences of a plea, it cannot be an "'intentional abandonment of a known right.'" Mellon, 118 S.W.3d at 345 (quoting State v. Mackey, 533 S.W.2d 337, 340 (Tenn. 1977)).

At the plea hearing, the prosecutor summarized the proof:

> Your Honor, at a trial of this matter the State's proof would show thru [sic] the witnesses listed on the indictment that between or during the month of May 2003, or at least the time preceding the finding and returning of the indictment that [the Petitioner] was a resident of Loudon County, Tennessee and that his family were close friends with [J.B.'s] family. That they often baby-sit with each other[']s children in each other[']s homes. And that the witness would testify that [the Petitioner] had an unlawful sexual contact with the victim alleged in the indictment at a time when this child was in the age frame listed by indictment.

The indictment charged the Petitioner with aggravated sexual battery and stated that the Petitioner did "unlawfully, intentionally, and knowingly engage in sexual contact with" the victim, who was "less than thirteen (13) years of age . . . ."

After the recitation of the State's proof, the following exchange occurred:

| THE COURT: | Do you agree that that is what the State's proof would show? |
|---|---|
| [THE PETITIONER]: | Yes, sir. |
| THE COURT: | Alright. What is your recommendation? |
| [THE STATE]: | Your Honor, the State has agreed upon [the Petitioner's] entering a Nolo Contendere plea to sexual battery by an authority figure. |

-28-

> To recommend to the Court a sentence of six years, Range One Standard, Class "C" . . . the Department of Corrections of course would be the agency governing his released date by parole and so forth.

. . .

> THE COURT: Is that the way you understand the agreement?
>
> [THE PETITIONER]: (nods yes to understanding)

Following the post-conviction hearing, the trial court found that the Petitioner's decision to plead nolo contendere was a tactical one and that

> even if the Petitioner did not have a clear understanding as to each and every element of each and every offense that might be involved in the case, a more complete understanding by him of the specific elements of any of the possibly involved offenses would not have resulted in a different decision by him or a different result. In any event, the Court does not find that he has established this ground by clear and convincing proof nor that he was so prejudiced by not understanding the elements of each and every such offense. This ground is without merit.

Although not raised by either party, we note that the trial court applied an incorrect standard. Our supreme court has recently clarified the correct standard for evaluating a post-conviction claim of ineffective assistance of counsel. See Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009); see also Tenn. Sup. Ct. R. 28 § 8(D)(1) (amended 2009). The petitioner must first "prove the fact of counsel's alleged error by clear and convincing evidence." Dellinger, 279 S.W.3d at 294. Clear and convincing evidence is evidence which leaves "no serious or substantial doubts about the correctness of the conclusions . . . ." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). If the petitioner meets his or her burden, the trial court must apply the Strickland analysis and determine whether counsel's error "'fell below an objective standard of reasonableness,' and whether the error raised 'a reasonable probability . . . that the result of the proceedings would have been different.'" Id. (quoting Strickland, 466 U.S. at 687-88, 694).

Under the standard expressed in Dellinger, the Petitioner was required to prove by clear and convincing evidence that trial counsel erred when trial counsel did not inform him of the nature and elements of the charges against him or the charge to which he pled. If the

Petitioner established this fact by clear and convincing evidence, the trial court was then required to apply the <u>Strickland</u> analysis. The court stated it found that the Petitioner did not establish by clear and convincing evidence that a more complete understanding of the specific elements of the charges would have resulted in a different plea or that the Petitioner was prejudiced by not understanding all the elements. The court did not determine whether the Petitioner had established counsel's error and, if so, whether that error was deficient and prejudiced the Petitioner.

Although the trial court applied an erroneous standard when evaluating whether the Petitioner received the ineffective assistance of counsel regarding the entry of his plea, we cannot conclude that the error "more probably than not affected the judgment" or resulted "in prejudice to the judicial process." T.R.A.P. 36(b). Notwithstanding the Petitioner's several meetings with trial counsel, the record reflects that the Petitioner was indicted for aggravated sexual battery and that the indictment cited the Code section that the Petitioner had been charged as violating. In addition, the waiver of jury trial form that the Petitioner signed listed the offense charged and stated the possible minimum and maximum punishments, including that the Petitioner would have to serve one hundred percent of his sentence if convicted. The waiver form also listed the offense to which the Petitioner pled nolo contendere, the applicable range of punishment, and the recommended sentence of six years as a Range I, standard offender. The Petitioner testified that he researched the elements of the offense charged. The record establishes that the Petitioner was aware of the nature and elements of the indicted offense and the offense to which he pled nolo contendere. The Petitioner is not entitled to relief on this issue.

Finally, the Petitioner contends that the trial court erred when it determined that he made a tactical decision to enter a plea of nolo contendere. The Petitioner faced a minimum sentence of eight years at one hundred percent service if he had proceeded to trial. The sentence to which he pled carried a less severe punishment. The evidence does not preponderate against the trial court's determination that the Petitioner made a tactical decision to plead to the offense with a lesser punishment.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court, we vacate the Petitioner's conviction, and we remand the case for further proceedings consistent with this opinion.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE